UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IVORY CHANEY                              CIVIL ACTION

VERSUS                                    NUMBER: 10-01134

MICHAEL J. ASTRUE,                        SECTION: "F"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


### REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits.  (Rec. docs. 14, 16, 17).

Ivory Chaney, plaintiff herein, filed the subject applications for DIB and SSI benefits on January 7, 2009, with a protective filing date of December 30, 2008, alleging disability as of July

13, 2008. (Tr. pp. 90-96, 87-89, 112).[1]/ In a "Disability Report-
Adult" form that appears in the record, the conditions resulting in
plaintiff's inability to work were identified as heart problems,
neck pain, and shoulder pain. (Tr. p. 116).   Those conditions
manifested themselves and rendered plaintiff unable to work on July
13, 2008, the same day that he was reportedly involved in a motor
vehicle accident. (Tr. p. 117).   Plaintiff's applications for
Social Security benefits were denied at the initial level of the
Commissioner's administrative review process on March 9, 2009. (Tr.
pp. 54-57, 58-61).   Pursuant to plaintiff's request, a hearing <u>de
novo</u> before an Administrative Law Judge ("ALJ") went forward on
July 29, 2009 at which plaintiff, who was represented by counsel,
and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 64,
30-50).   On August 28, 2009, the ALJ issued a written decision in
which he concluded that plaintiff was not disabled within the
meaning of the Social Security Act. (Tr. pp. 18-29).   The Appeals
Council ("AC") subsequently denied plaintiff's request for review
of the ALJ's decision, thus making the ALJ's decision the final
decision of the Commissioner. (Tr. pp. 5-8, 1-4).   It is from that
unfavorable decision that the plaintiff seeks judicial review

---

[1]/   A   review   of   the   administrative   record   reveals   that
plaintiff had previously filed an application for DIB that was
denied at the first step of the Commissioner's administrative
review process on November 27, 1995. (Tr. p. 113).

pursuant to the 42 U.S.C. §§405(g) and 1383(c)(3).

In the cross-motion for summary judgment that he submitted pro se, plaintiff presents no specific challenge to the Commissioner's decision but instead sets forth a chronological listing of the medical care he has received, including care which post-dates the action of the AC on his request for review. (Rec. docs. 14, 17). Medical records from that treatment are attached to plaintiff's cross-motion as well as to his opposition to defendant's motion. (Id.). The Court thus construes plaintiff's motion as presenting an overall challenge to the sufficiency of the evidence supporting the Commissioner's decision.  Relevant to the resolution of that issue are the following findings  that were made by the ALJ.

    1.    [t]he claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

    2.    [t]he claimant has not engaged in substantial gainful activity since July 13, 2008, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

    3.    [t]he claimant has the following severe impairments: Degenerative Joint Disease, Degenerative Disc Disease and Sinus Bradycardia (20 CFR 404.1520(c) and 416.920(c)).

    4.    [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985).

    5.    [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR

404.1567(b) and 416.967(b) except Claimant would be limited to lifting and carrying items weighing a maximum of 5 pounds with his left hand and items weighing greater than 5 pounds with the dominant right hand only. He could walk and stand up to 6 hours out of an 8 hour work day and sit up to 6 hours during an 8 hour work day. He would have slight to moderate limitations in the ability to maintain attention and concentration for extended periods of time and complete work tasks in a normal work day at a consistent pace. He would be further precluded from all continuous outside work.

6.   [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   [t]he claimant was born on December 20, 1959 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   [t]he claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   [t]ransferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.  [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  [t]he claimant has not been under a disability, as defined in the Social Security Act, from July 13, 2008 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 23-24, 27, 28).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the

4

Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C §405(g); Richardson v. Perales, 402 U.S. 389, 91 St.Ct. 1420 (1970).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act.  Harrell v. Bowen. 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12

5

months."   42 U.S.C §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the 5-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

> 1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

> 2. an individual who does not have a "severe impairment" will not be found to be disabled.

> 3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

> 4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

> 5. if an individual's impairment preclude him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 St.Ct. 2287, 2294 n.5 (1987).   If the analysis reaches the

fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

At the time of the administrative hearing that was held on July 29, 2009, plaintiff was 49 years of age, had completed eleven years of formal education, and had taken the GED test but was unaware of the results.  He could read, write, and do simple math and he had a driver's license. Past relevant work included that of a sanitation worker, laborer for a brick company, and janitor. Plaintiff testified that he had worked for Waste Management up until August 2, 2008 when he was let go due to being absent from work to attend doctors' appointments at a rate of 2 to 3 times per week.  He was initially put on short term disability but the number of checks he was receiving declined. Plaintiff later filed for workers' compensation but only received one payment.

Recalling his working days at Waste Management, plaintiff testified that on July 13th of an unidentified year, he suffered a heat stroke while on the job followed by a second such occurrence

the next day.[2]/ The company then sent him to the hospital which, following evaluation, referred him to a heart specialist who recommended the implantation of a pacemaker to regulate his heartbeat.  That procedure eventually took place nine days prior to the hearing and plaintiff was discharged from the hospital the following day with a restriction against lifting anything with the left arm for two weeks.  Plaintiff himself was right-handed. Immediately prior to the implantation plaintiff had performed part-time catering work at the Convention Center but the prospect that he would continue to do so in the future was minimal. Nevertheless, plaintiff had a doctor's appointment scheduled for the following day for possible clearance to return to work. (Tr. pp. 32-42).

Upon being questioned by his attorney plaintiff testified that a fluctuating heart rate was what had led to the implantation of the pacemaker.  He was not particularly active prior to the implantation and he planned on returning home to rest at the conclusion of the hearing as he was unable to sit for extended periods of time.  Plaintiff also suffered from shoulder problems after experiencing a fall at work in early August.  After he had

---

[2]/ In his cross-motion for summary judgment and his opposition to defendant's motion plaintiff asserts that his first heat stroke occurred on August 13, 2007 rather than July 13th. (Rec. docs. 14, p. 1; 17, p. 1).

been let go by Waste Management plaintiff continued to experience shoulder pain and eventually went to the East Jefferson General Hospital thinking that it was a rotator cuff problem.  Plaintiff was given Ibuprofen and Vicodin and was referred to LSU where he underwent MRIs and was told that he had a broken bone that would eventually heal itself.  He continued to experience shoulder pain especially when lifting and holding objects for too long.  For his pain plaintiff had been prescribed Vicodin and Flexeril but he primarily took Advil for relief. (Tr. pp. 42-45).

Patricia Ehrlinger, a VE, was next to take the stand.  She testified that plaintiff's past jobs as a sanitation worker and a laborer were very heavy, unskilled work and that his job as a janitor was medium, unskilled work. The ALJ then posed a hypothetical question to the VE which assumed an individual with plaintiff's education who possessed a driver's license; was closely approaching advanced age; and, was capable of sedentary to light work with limitations against continuous outside work and against lifting in excess of 20 pounds with the right hand on an occasional basis, lifting in excess of 10 pounds with the right hand on a frequent basis, and lifting greater than 5 pounds with the left hand.  In answer thereto, the VE testified that the individual described in the hypothetical question would be unable to perform plaintiff's past work. However, the individual would be able to

function as a security guard, usher, or information clerk with sufficient numbers of such jobs existing in the national and local economies.  To the hypothetical question as initially framed, the ALJ then added a slight to moderate limitation in the ability to maintain attention and concentration for extended periods and to complete work tasks in a work day at a consistent pace.  In answer to the hypothetical question as amended, the VE testified that the three jobs she had originally identified could still be performed. (Tr. pp. 45-48).

The VE was then tendered to plaintiff's counsel for further questioning who added to the first hypo that had been framed by the ALJ the requirement that the individual be able to lie down more than one hour per day due to fatigue.  With that added limitation, the VE testified that the individual would be unable to work.  The same result would obtain if the individual suffered from marked, rather than slight to moderate, limitations in the two capabilities the ALJ had included in his second hypothetical question.  In closing, counsel argued that in light of plaintiff's lengthy work history, it was fair to assume that he would be working if he was physically capable of doing so. However, the combined effects of his ischemic heart disease resulting in the implantation of a pacemaker, bilateral shoulder problems demonstrated through MRIs, and fatigue and pain components rendered plaintiff disabled. (Tr.

10

pp. 48-50).

The documentary evidence admitted in the administrative proceedings below includes a "Function Report-Adult" form that was presumably completed by plaintiff around the time that he applied for Social Security benefits.  On the form plaintiff indicated that his daily activities included watching TV, cooking meals, going to a relative's house, and sleeping.  As a result of his impairments plaintiff was unable to work and slept less.  However, he could tend to his own personal needs, prepare simple meals, do household chores such as washing clothes, drive and go out alone, shop, and handle financial matters.  Hobbies included watching TV daily and playing unidentified sports once per week.  Plaintiff took a walk or played billiards once per week and he visited friends every day for 1 to 1.5 hours.  On the sixth page of the form plaintiff indicated that his conditions affected nearly all of his abilities, that he could not walk too far or sit or stand too long. Nor could he lift or carry heavy items, or remember or concentrate as he once had.  Nevertheless, he estimated that he could walk 1 to 1.5 miles before needing to rest for 15 minutes. (Tr. pp. 133-141).

Medical records from the Heart Clinic of Louisiana which were generated prior to the alleged onset date reflect that plaintiff had an episode of dizziness in August of 2007 while he was working in the hot sun.  Plaintiff was noted to be very bradycardic and

further testing was ordered including a Holter monitor. An EKG done on August 7, 2007 showed sinus bradycardia but with no evidence of high-degree AV block.  Plaintiff underwent a maximum stress test on August 21, 2007 that was positive for ischemia but was negative for arrhythmias. (Tr. pp. 173-175).  He saw Dr. Brian Cospolich to obtain the results of the test on August 23, 2007.  Plaintiff had no symptoms at the time but further testing was ordered given the borderline positive EKG results.  The diagnosis was sinus bradycardia and one episode of dizziness.  Plaintiff was to remain off work pending the completion of the stress testing unless he was able to find some light-level job. (Tr. pp. 171-172).  A stress/rest Cardiolite Perfusion Study was performed the following day which produced essentially normal results. (Tr. pp. 167-170). Plaintiff returned to Dr. Cospolich for further evaluation on August 31, 2007.  Despite still being bradycardic, plaintiff was cleared to return to work given the excellent exercise capacity that he demonstrated on stress testing.  Plaintiff was to be referred to Dr. McKinnie for outpatient evaluation but he was not deemed to be a candidate for a pacemaker at that point in time. (Tr. pp. 165-166).

The next medical records document x-rays taken of plaintiff's left shoulders on January 31, 2008 at the West Jefferson Medical Center ("WJMC") that revealed no acute osseous findings. (Tr. p.

12

177).  Approximately 1 year later plaintiff presented himself to the East Jefferson General Hospital ("EJGH") emergency room with complaints of shoulder pain for the previous 2 years.  The pain was worse with movement but with no numbness or paresthesia and relief was obtained with Ibuprofen, Flexeril, or an unnamed pain killer plaintiff had run out of.  On physical examination, there was no swelling and a full range of passive motion to the shoulders but there was pain upon abduction, particularly to 90 degrees.  The diagnosis was chronic shoulder pain and rotator cuff tendonitis. Plaintiff was prescribed Ibuprofen and Vicodin, was referred to the LSU Orthopedic Clinic, and was advised on various treatment options. (Tr. pp. 208-209, 179-182).

On February 16, 2009, plaintiff was consultatively evaluated by Dr. Miljana Mandich with the presenting complaints being multiple aches and pains and a slow heartbeat.  Plaintiff related the pain in his neck, lower back, and right shoulder to a car accident eight months earlier as well as a long history of on-and-off problems with the left shoulder unassociated with any injury. Plaintiff had been diagnosed with high blood pressure two years earlier for which he took medication for a time but had discontinued it.  After reviewing the records from plaintiff's cardiologic evaluation in August of 2007, Dr. Mandich noted that plaintiff had experienced only one episode of dizziness while

13

working in the heat and he denied any significant light headedness or dizziness and had never fainted. Plaintiff occasionally experienced a 2 to 3-minute throbbing sensation in the left side of his chest which occurred when he was lying down watching TV.

In describing plaintiff's personal and social history, Dr. Mandich remarked that plaintiff had been employed by Waste Management until the motor vehicle accident approximately eight months earlier. He then worked for temporary services off-and-on, the most recent time being a week earlier. On physical examination, plaintiff guarded his neck and limited the range of motion in all directions, complaining of pain along the right paracervical muscles. Plaintiff had a normal range of motion to the lower back but complained of some pain in the right lower flank above waist-level. Straight leg raising was negative bilaterally. Use of the extremities were normal except for the guarding of both shoulders and limited range of motion, the left more than the right, as well as pain over the top of each shoulder. Neurologically, muscle bulk, tone, and strength were normal bilaterally; sensation and reflexes were intact; and gait was normal. The cardiovascular system was also normal. X-rays of the left shoulder revealed an abnormal clavicular end and left acromioclavicular articulation. Similar studies of the cervical spine demonstrated degeneration at the third through sixth cervical

14

discs.  Dr. Mandich's diagnoses were neck and bilateral shoulder pain and sinus bradycardia by history.  In the summary portion of her report, the doctor noted that plaintiff ambulated with no difficulty, had normal blood pressure, and had a normal cardiovascular exam.  Decreased range of motion to the neck and shoulders was present and there was some pain in the right flank muscles although the range of motion to the lower back was normal. The neurological aspect of the exam was normal; there were no signs of cervical or lumbar radiculopathy; and the rest of the physical examination was unremarkable. (Tr. pp. 183-192).

On March 6, 2009, plaintiff presented himself to the Medical Center of Louisiana at New Orleans ("MCLNO") with complaints of left shoulder pain since September of 2008 which was then at level "8".  There was increased pain with overhead activities as well as morning stiffness.  X-rays of the affected area showed irregularities of the distal clavicle, glenoid rim, and subarticular portion of the glenoid.  It was felt that an MRI would aid in a more definitive evaluation of the condition. Plaintiff was prescribed anti-inflammatories and an MRI was ordered. (Tr. pp. 204-207).

On March 9, 2009, an Administration medical consultant reviewed plaintiff's file and set forth his opinion in the standardized form denominated "Physical Residual Functional

Capacity Assessment."   There, the consultant checked off the appropriate boxes on the form to indicate that plaintiff could occasionally lift and/or carry 20 pounds and could frequently lift and/or carry 10 pounds; could sit, stand, and/or walk for 6 hours per 8-hour workday; had an unlimited ability to push and/or pull; could occasionally perform three of the enumerated postural maneuvers and frequently perform the other four; was limited in reaching but not the other three manipulative maneuvers; and, had no visual communicative, or environmental limitations.   Although the plaintiff's symptoms were deemed to be credible they were not sufficiently severe to preclude the performance of light-level work activity. (Tr. pp. 193-200).

At the request of Dr. Charles Billings, on March 31, 2009 plaintiff underwent an MRI of the upper extremities without contrast at MCLNO.   The testing itself was moderately limited by motion artifact but the radiologist's ultimate impression was subscapular stenosis, biceps tendinosis, and insertional-type low grade articular surface tearing of the infraspinatus tendon. (Tr. pp. 202-203).   Plaintiff returned to MCLNO on April 21, 2009 to obtain the MRI results and the treatment note from that day suggests that plaintiff's left shoulder difficulties were the result of a fall that he sustained in August 2008.   Owing to being out of work, plaintiff reported that his shoulder pain had improved

somewhat.   On physical examination, plaintiff had no real point tenderness, had a good range of motion, had no pain with passive abduction or internal and external rotation, and had no impingement sign.   X-rays were interpreted as showing an old type 1 AC separation and MRI studies revealed a mild supraspinatus tear, partial, with the insertional portion of the tendon.   Surgery was ruled out and it was recommended that plaintiff go through a 6 to 8-week course of physical therapy. (Tr. pp. 212-213).

The next medical records were generated on July 2, 2009 when plaintiff was seen at MCLNO for work-up for possible pacemaker placement, having had a near syncopal episode the previous Tuesday. Plaintiff recalled a history of heart palpitations since 2007 which occurred when he was active and sometimes resulted in near syncopal episodes but with no loss of consciousness.   His heart was bradycardic but no murmurs, rubs, or gallops were detected. Various tests were ordered and Vicodin was prescribed. (Tr. pp. 214-218, 236).   An EKG was subsequently performed on July 10, 2009 which revealed good LV function and no significant echocardographic abnormalities. (Tr. pp. 227-228).   Chest x-rays taken on July 17, 2009 were negative and various other tests were run, including bloodwork. (Tr. pp. 229, 232-235).

In light of his symptomatic bradycardia, on July 20, 2009, plaintiff underwent surgical implantation of a pacemaker at MCLNO.

X-rays taken during the course of the procedure revealed plaintiff's heart size to be within normal limits. Plaintiff tolerated the procedure well and was discharged home the following day with a restriction against lifting with the left arm for two weeks. (Tr. pp. 225-226, 230-231, 219). As noted earlier, the hearing before the ALJ would subsequently go forward on July 29, 2009. The ALJ issued his unfavorable decision on August 28, 2009 and the AC denied plaintiff's request for review of that decision on February 19, 2010.

Having reviewed the record in its entirety, the Court believes that substantial evidence supports the ALJ's conclusion that plaintiff was not disabled between the alleged onset date of July 13, 2008 and the date of the ALJ's decision. The medical records indicate that plaintiff was seen at the Heart Clinic of Louisiana in August of 2007 after experiencing an episode of dizziness while working the hot sun. An EKG performed on August 16, 2007 was positive for bradycardia and a stress test done on August 21, 2007 produced findings suggestive of ischemia. When plaintiff saw Dr. Cospolich to obtain the results of the tests on August 23, 2007 he was symptom-free. As a precaution, further confirmatory testing was ordered and plaintiff was kept off anything greater than light-level work pending completion of the testing. A subsequent Cardiolite Study produced normal results and plaintiff was cleared

18

to return to work without restrictions on August 31, 2007.

On January 31, 2008, x-rays of plaintiff's left shoulder were taken which revealed no acute osseous findings.  Plaintiff filed his applications for Social Security benefits almost a year later on January 7, 2009 alleging disability as of July 13, 2008, the day he was reportedly involved in a motor vehicle accident. Plaintiff presumably completed the Function Report around this time in which he indicated that he could cook, do household chores, drive, shop, and walk up to 1.5 miles at a time.  Such activities can properly be considered by an ALJ in determining a claimant's disability status.  Leggett v. Chater, 67 F.3d 558, 565 n. 12 (5th Cir. 1995). Although plaintiff would subsequently testify at the administrative hearing that he was let go by Waste Management on August 2, 2008 because of numerous work absences to attend doctor's appointments, the only treatment record that was generated in 2008 other than the shoulder x-rays noted above was a note from Dr. Morris dated March 10, 2008 in which plaintiff was being referred to an orthopedist after seeing that doctor twice and experiencing no improvement to his shoulder for two months.[3]/

---

[3]/ The March 10, 2008 treatment note was not admitted in the administrative proceedings below but is instead attached to plaintiff's cross-motion for summary judgment. (Rec. doc. 14-1, pp. 4-5).  As will be discussed infra, plaintiff makes no showing of cause as to why the treatment note could not have been obtained earlier and presented to the Administration during the pendency of

Plaintiff was seen at the EJGH emergency room on January 29, 2009 for left shoulder pain for the previous two years.  The existence of such pain apparently did not prevent plaintiff from working at Waste Management up until August 2, 2008, Johnson, 864 F.2d at 347-48, and the fact that an individual is unable to work without experiencing pain is not an automatic ground for obtaining Social Security benefits. Owens v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1995)(citing Jones, 702 F.2d at 621 n. 4).  The next group of medical records was generated in connection with Dr. Mandich's consultative evaluation of February 16, 2009 at which plaintiff reported that he had worked for a temporary employment agency only one week earlier.  There was some guarding, limitation of motion, and pain to the shoulder, neck, and low back but grip strength was normal as were the results of a neurological evaluation.  The cardiovascular system was also normal.  The diagnosis was neck and bilateral shoulder pain and bradycardia by history.  No limitations were placed on plaintiff's activities.

On March 6, 2009, plaintiff was seen again at the MCLNO emergency room for complaints of left shoulder pain, increased with overhead activity, and morning stiffness.  Anti-inflammatories were prescribed and an MRI was ordered.   An Administration medical

the proceedings below.

consultant reviewed plaintiff's file on March 9, 2009 and concluded
that he could perform light-level work.  An MRI was performed on
March 31, 2009 which undoubtedly produced some abnormal findings
including biceps tendinosis and low grade articular surface tearing
of the infraspinatus tendon. However, when plaintiff returned to
MCLNO to obtain the results of the testing on April 21, 2009, he
had decreased pain, no real point tenderness, a good range of
motion  of the upper extremities, no pain with abduction or
rotation, and no impingement sign.  The MRI was interpreted as
demonstrating only a mild supraspinatus tear and the only treatment
that was recommended was a 6 to 8-week course of physical therapy.

Plaintiff experienced a second near syncopal episode in the
latter part of June of 2009 which led to his work-up at MCLNO for
possible pacemaker placement. His heart was still noted to be
bradycardic but there were no murmurs, rubs, or gallops. An EKG was
done on July 10, 2009 which demonstrated good LV function and no
significant abnormalities and chest x-rays taken on that date were
negative.  To better regulate his heartbeat, plaintiff subsequently
underwent implantation of a pacemaker on July 20, 2009.  Plaintiff
was discharged the following day with a restriction against lifting
anything with the left arm for two weeks.  That was the only
restriction any of his doctors had imposed on him other than the
limitation against anything greater than light-level work that was

imposed on him pending the completion of the stress testing that was done in August of 2007. <u>Leggett</u>, 67 F.3d at 565. Despite undergoing the work-up and implantation in the summer of 2009, plaintiff was able to do part-time catering work almost up to the time of his surgery.

With plaintiff's cardiological difficulties having been stabilized by virtue of the pacemaker implantation, the ALJ posed a hypothetical question to the VE at the administrative hearing that primarily accounted for the limitations that would be expected to result from his shoulder impairment. In answer to that hypothetical question, the VE testified to the existence of various light and sedentary jobs plaintiff should be capable of performing. The VE's testimony to that effect constitutes substantial evidence supporting the Commissioner's decision that plaintiff was not disabled.

As was noted earlier, attached to plaintiff's cross-motion for summary judgment and his opposition to defendant's motion are various records of medical treatment he has received. With the exception of the first page of the EJGH emergency room report of January 29, 2009 (rec. doc. 14-1, p. 6), none of the other records were admitted in the administrative proceedings below. The bulk of the records not having been previously presented to the Administration, they amount to new medical evidence which is coming

to light for the first time.  The Court can order that a case be remanded to the Commissioner to consider new medical evidence "... only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. §405(g).  In order to justify a remand, three criteria must be satisfied.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995); Pierre v. Sullivan, 884 F.2d 799, 803 (5th Cir. 1989).  First, the evidence must be "new" and not merely cumulative of what is already in the record.  Szubak v. Secretary, 745 F.2d 831, 833 (3rd Cir. 1984).  Second, the evidence must be "material" such that there is a "reasonable possibility" that the evidence would have changed the outcome of the Commissioner's decision.  Latham v. Shalala, 36 F.3d 482, 483 (5th Cir. 1994)(citing Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981)).  The materiality requirement also contains a temporal element that the evidence relate to the time period for which benefits were denied and not merely concern a subsequently-acquired disability or the deterioration of a condition that was not previously disabling.  Leggett, 67 F.3d at 567; Latham, 36 F.3d at 482.  Finally, the claimant must demonstrate good cause for not having incorporated the new evidence into the prior administrative record.  Pierre, 8884 F.2d at 803.

Plaintiff attaches to his cross-motion for summary judgment

23

medical records that were generated on fourteen separate dates.  As noted above, the first page of the EJGH emergency room report from January 29, 2009 was admitted in the administrative proceedings and is thus duplicative. Of the remaining thirteen sets of medical records, eight were generated prior to the issuance of the ALJ's written decision and 1 set, x-rays taken at MCLNO on February 5, 2010, were generated subsequent to the ALJ's written decision but prior to the date that the AC acted on plaintiff's request for review. (Rec. doc. 14-1, pp. 1-5, 9, 14-18). No showing of cause, good or otherwise, is made as to why these records could not have been obtained sooner and presented to the Administration for its consideration during the pendency of the administrative proceedings.  That being the case, a remand based on the medical records pre-dating February 19, 2010 is not warranted here. Pierre, 884 F.2d at 803.  The Court will thus turn to the medical records that were generated subsequent to the action of the AC on plaintiff's request for review.

The medication list dated April 1, 2010, while "new", provides little insight into plaintiff's ability to work and thus fails the remand test's materiality element. (Rec. doc. 14-1, p. 23).  X-rays taken at MCLNO on May 7, 2010 fall into the same category: those of the shoulders revealed no abnormalities of the osseous structures and those of the cervical spine showed chronic spondylosis but no

other acute abnormalities. (Rec. doc. 14-1, pp. 10-12). Those minimal findings do not create a "reasonable possibility" that they would have changed the outcome of the Commissioner's decision. Chest x-rays taken on May 15, 2010 were normal and also would not have changed the outcome of the administrative proceedings. (Rec. doc. 14-1, p. 13). On that same date, plaintiff was seen at the LSU emergency room on May 15, 2010 and was referred to the Cardiology Department for an episode of chest pain and palpitations but he was ultimately discharged with instructions to resume normal activities and only a stress test was ordered. (Rec. doc. 14-1, pp. 19-21). Again, materiality is lacking here.

The final set of "new" medical records that are attached to plaintiff's motion are dated October 4, 2010. The medication list bearing that date says little about plaintiff's ability to perform the light and sedentary-level jobs that were identified by the VE. (Rec. doc. 14-1, pp. 22). Plaintiff also underwent a new patient evaluation at MCLNO that date for his left shoulder pain during which surgery was ruled out and plaintiff admitted that Flexeril was helpful and that Tramadol decreased his pain to a manageable level. (Rec. doc. 14-1, pp. 7-8). An impairment that can reasonably be controlled with treatment or medication is not disabling. <u>Johnson</u>, 864 F.2d at 348. On physical examination, plaintiff had a full passive range of motion bilaterally to the

upper extremities.   However, left posterior shoulder pain was elicited with resistence to external rotation and pain with pressure was present at the left acromioclavicular joint.  The diagnosis was left shoulder pain from acromioclavicular osteo-arthritis.  Plaintiff was given a steroid injection and experienced significant relief and he awaited a referral to physical therapy. Given the residual functional capacity assessment that the ALJ made as respects plaintiff's left arm, the Court does not believe that there is a reasonable possibility that the outcome of the administrative proceedings would have been different if that treatment note had been admitted.

    The medical records that are attached to plaintiff's opposition to defendant's motion for summary judgment are all "new" in the sense that they document medical care that plaintiff received after the administrative proceedings below had been completed.  Among those records are x-ray results of plaintiff's shoulders and cervical spine on May 7, 2010 which revealed chronic spondylosis but no other abnormalities. (Rec. docs 17-1, 26-29). Plaintiff was seen at the LSU emergency room on May 15, 2010 for complaints of heart palpitations over the previous few weeks but after testing he was discharged with instructions to resume normal activities and a stress test was ordered. (Rec. docs. 14-1, pp. 19-

20 and 17-1, pp. 12-17, 19-20, 30-31).[4]  A chest x-ray taken at
the time was normal. (Rec. doc. 17-1, p. 25). A consent form for
treatment dated August 13, 2010 is also among the attachments to
plaintiff's opposition but it contains no medical findings. (Rec.
doc. 17-1, p. 24). A universal protocol and consent form generated
in connection with plaintiff's left shoulder steroid injection on
October 4, 2010 and from which he received significant relief are
additional attachments to plaintiff's opposition. (Rec. docs. 14-1,
pp. 7-8 and 17-1, pp. 1-6). Finally, plaintiff was further
evaluated and received trigger point injections for his left
shoulder pain on January 3, 2011. (Rec. docs. 14-1, pp. 7-8 and 17-
1, pp. 6-11). However, he still had a full range of motion to the
left shoulder although there was some tenderness to the left upper
and middle trapezius. (Id.). No restrictions were placed on
plaintiff's activities and he was to return for follow-up in three
months. (Id.). Here, again, the Court does not believe that
consideration of this recent report would have changed the outcome
of the administrative proceedings as the residual functional
capacity assessment that was made by the ALJ adequately accounted
for the limitations resulting from plaintiff's shoulder impairment.

---

[4] Also attached to plaintiff's opposition are ECG results
dated May 13, 2010 but no corresponding physician's treatment note.
(Rec. doc. 17-1, p. 18).

A remand is thus not warranted.

**RECOMMENDATION**

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this 12th day of _____May_____, 2011.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

28